Katerina **LEVENDOS**, Plaintiff,

v.

**STERN ENTERTAINMENT, INC.**, et al., Defendant.

Elizabeth **LEVENDOS**, Plaintiff,

v.

**STERN ENTERTAINMENT, INC.**, et al., Defendant.

Civ. A. Nos. 84–3051, 84–3053.

United States District Court,
W.D. Pennsylvania.

Oct. 4, 1989.

Kenneth Gormley, Mansmann, Cindrich & Huber, Pittsburgh, Pa., for plaintiffs.

Ronald L. Hicks, Jr., Meyer, Unkovic & Scott, Pittsburgh, Pa., for defendant.

OPINION

DUMBAULD, Senior District Judge.

After a non-jury trial, the Court makes the following Findings of Fact, Conclusions of Law, and Judgment:

1. These are consolidated sex discrimination cases under 42 U.S.C. § 2000e–2(a)(1) which provides:

It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

As to the legislative history of the inclusion of sex as a forbidden basis of discrimination, see *Bradford v. Peoples Natural Gas Co.*, 60 F.R.D. 432, 434–35 (W.D.Pa. 1973).

2. The applicable law and procedure is clearly stated in *Dillon v. Coles*, 746 F.2d 998, 1002–1005 (C.A. 3, 1984), reviewing in particular the leading cases of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–805, 93 S.Ct. 1817, 1823–1825, 36 L.Ed.2d 668 (1973), and *Texas Dept. v. Burdine*, 450 U.S. 248, 252–59, 101 S.Ct. 1089, 1093–97, 67 L.Ed.2d 207 (1981). Concerning the doctrine of "constructive discharge," see *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (C.A.3, 1984).

3. Plaintiff in No. 84–3051, Katerina Levendos, of the female sex, is a resident of Pittsburgh, Allegheny County, Pennsylvania. She duly received a right to sue letter after complaining to the E.E.O.C. [PX–8] This Court has jurisdiction of the case.

4. Plaintiff in No. 84–3053, Elizabeth Levendos, of the female sex, mother of Katerina Levendos, is a resident of Pittsburgh, Allegheny County, Pennsylvania. She duly received a right to sue letter after complaining to the E.E.O.C. [PX–22] This Court has jurisdiction of the case.

5. Evidence was received at a hearing held on June 6, 1988, and after remand in *Elizabeth Levendos v. Stern Entertainment*, 860 F.2d 1227 (C.A. 3, 1988) on April 19, 20, and 24, 1989 (total of 833 pages). All evidence is applicable in both cases.

6. Defendant Stern Entertainment Inc., is apparently non-existent. Defendant Stern Entertainment Systems, Inc., apparently the proper defendant, is a Pennsylvania Corporation having its principal place of business on the thirteenth floor, Fulton Building, in Pittsburgh.

7. At all relevant times defendant Stern Entertainment Systems owned and operated a restaurant known as "Les Nuages Restaurant", as well as a discotheque known as "Heaven", both located at 105 Sixth Street, Pittsburgh. A part of the discotheque was known as the Orion Club.

Richard Stern was owner and president of the corporation and actively engaged in the business. Herman Hartman, the general manager, reported to him: Hartman's primary responsibility was for the night club, assisted by Robert Davis. Under Hartman was Robert Schilling, assistant manager for liquor, Chef David DeVos, and Elizabeth Levendos, Maitre d' hotel. DeVos and Levendos were co-ordinate, neither being responsible to or for the other, but both reporting to Hartman. [Tr. 147 (June 6, 1988); Tr. 154–56 (April 20, 1989); Tr. 75–77 (April 24, 1989)]

8. Plaintiff Katerina Levendos in No. 84–3051 was employed at the restaurant, first in August 1980 as a bus girl, then a captain, then a waiter. The position as waitress enabled her to receive tips in addition to the standard minimum wage. Her performance was good and no complaints or reprimands were received. The restaurant closed in December of 1982.

Plaintiff Elizabeth Levendos, in No. 84–3053 went to work at Les Nuages when it opened late in 1979, or early 1980 and when she submitted a letter of resignation on April 22, 1982, had been maitre d' since October, 1981. She was replaced by Robert Ashurst. [Tr. 272–73 (June 6, 1989)]

9. On July 2, 1982, the restaurant began an early morning breakfast shift, hoping that when the discotheque closed, its patrons would come to the restaurant for breakfast. Plaintiff Katerina Levendos, Robert Cottrell, and Robert Roth were waiters for that shift. Cottrell was drunk and was sent home.

10. At one of the tables which Cottrell should have been serving there were customers. Plaintiff took their order, but before it was ready to be served the customers left.

11. Plaintiff was subsequently summoned to the Orion Club area, where Robert Ashurst, who had replaced Elizabeth Levendos as maitre d' hotel, and Herman Hartman, the general manager, were seated at the bar with partially full glasses of light brown fluid in front of them. [Tr. 69–70 (June 6, 1988)] Ashurst told her she was being fired. He said the customers had complained that she had rudely called them profane epithets. Plaintiff was upset and cried and wanted in writing the names of the customers and the reason for being fired. Thereupon Ashurst and Hartman called plaintiff profane epithets and physically escorted her to the elevator. Plaintiff was angry and smashed a glass bread and butter plate on the floor. Ashurst returned to the kitchen and told her to return Tuesday, the next working day, to discuss whether or not she was really terminated. [Tr. 23–28 (June 6, 1988)]

12. On Tuesday, Ashurst and Hartman gave her a memorandum dated July 6, 1982, stating reasons why she had been fired. This was Plaintiff's Exhibit 2, Defendant's Exhibit B. It had been dictated by Richard Stern [Tr. 245–46 (June 6, 1988)]. Plaintiff testified that she was not given a copy of the memorandum, and that it was signed only by Ashurst and Hartman. [Tr. 30 (June 6, 1988)] As received in evidence it bore also the signature of Robert Davis, assistant manager of the Stern operation, who testified that "the three of us, we decided to protect ourselves." [Tr. 207 (June 6, 1988)]

13. Accordingly the Court as trier of facts and credibility of evidence, rejects the accuracy of PX–2, DX–B, it being a document prepared simply for expediency in case of potential litigation—*pour les besoins de la cause*—as European jurists would say. The Court finds that the legitimate reasons advanced are pretextual and finds for plaintiff on the third step of the *McDonnell Douglas* schema, and on plaintiff's ultimate burden of persuasion finds for the plaintiff.

14. Richard Stern was not involved in the case of Katerina other than as author of PX–2. The corporate defendant is liable only on the basis of respondeat superior, or for hiring an improper person as supervisor, or for failure to supervise. The actual discharge was by Robert Ashurst. As maitre d' hotel he had authority over restaurant personnel [Tr. 167 (April 20, 1989)]. Hartman was merely drinking with Ashurst when Ashurst fired plaintiff, and assisted in vigorously escorting her from the Orion Club area. Hartman did not witness plaintiff's alleged behavior towards the customers on July 2, 1982, but relied on Ashurst's representations when he signed Exhibit 2. Hartman's deposition is therefore not primary evidence; there was no testimony from Ashurst.

15. Many employees and customers of the restaurant were confessedly and reputedly homosexual, including Ashurst and Hartman. Plaintiff's contention that Ashurst disliked women and hired fellow homosexual males, and therefore discharged

plaintiff, is not persuasive. [Tr. 75, 84, 330 (June 6, 1988)]

16. However, the Court finds that Ashurst's professional opinion was that women should not be waiters in a high-class restaurant, but men wearing tuxedos present a better image. As maitre d' he knowingly discriminated *e.g.* by disparate treatment of females in hiring and by assignment of tables with large parties and lucrative tips to male waiters, and in other practices. When he replaced Elizabeth Levendos as maitre d' there were two female waitresses on the wait staff at Les Nuages; after the discharge of Katerina Levendos there were none, and the restaurant closed soon thereafter, before there was occasion to fill the vacancy created by her discharge. [PX–26, pp. 25–26, 28, 30, 72]

17. But the Court does not accept sex as a bfoq (bona fide occupational qualification) for waiters in a high-class restaurant. Such an opinion or practice would frustrate the purpose of the anti-sex discrimination statute. The Court takes judicial notice that Pittsburgh's newest hotel, the Vista, (where the Prince of Wales was entertained during a recent visit to Pittsburgh) operates high-class restaurants; and that at a lawyers' dinner at the Vista the waiters were women, who were not in uniform of any kind, but apparently wearing their street clothes. The Court rejects the bfoq defense, and holds defendant liable for the intentional sex discrimination against plaintiff under agency principles.

18. The appropriate remedy is to award plaintiff what her adjusted earnings would have been from July 2, 1982 to the date in December 1982 when Les Nuages restaurant closed and went out of business. If this amount cannot be stipulated by agreement of the parties, a hearing on the relief issue shall be held subsequently.

19. As to Elizabeth Levendos, plaintiff in No. 84–3053, the essence of her complaint is well summarized in the following paragraph from the majority opinion of the Court of Appeals:

We emphasize that the fact-finder must assess the veracity and weight of Levendos's various factual allegations. While we can imagine a maitre'd who might not object to exclusion from management meetings, denial of authority to order supplies, false accusations of stealing from and drinking on the job, and who might not be disturbed by rumors and remarks that she would be replaced by a male, her employer's refusal to talk with her, and to find wine bottles in her locker, we find these events are clearly not trivial. It is of course plausible that a jury could decide ultimately that a reasonable person would tolerate some or even all of these occurrences without being forced to quit. It is equally plausible, however, that a jury would come to the opposite conclusion.

20. The Court as trier of fact accepts the veracity and credibility of the testimony in support of the allegations of plaintiff Elizabeth Levendos. It then becomes necessary to consider whether "a reasonable person would tolerate some or all of these occurrences without being forced to quit." It must not be forgotten that this plaintiff's case depends upon proof of "constructive discharge," because in fact on April 22, 1982, she submitted a letter of resignation addressed to "Mr. Stern" reading as follows:

A short while ago, it was brought to my attention by Chef DeVos that you were questioning my integrity, or to put it bluntly, that I was suspected of stealing. Compared to that, Mr. Stern, everything else is insignificant. As of today, please accept my resignation as a Maitre D' at your restaurant. [DX–N]

21. In Elizabeth's case, No. 84–3053, the owner, Richard Stern, testified. [He did not testify in No. 84–3051, but his testimony is applicable to both cases.] He said that he was a "hands-on" manager in his business [Tr. 154–63 (April 20, 1989)]. In connection with Elizabeth's resignation or constructive discharge he was the active agent of the corporation.

22. Elizabeth Levendos voluntarily chose to resign in her letter of April 22, 1982, rather than seeking opportunity for Stern to clarify or verify or dispel and

disavow allegations or suspicions detrimental to her reputation.

23. Stern simply applied the sound rule of personnel administration that productivity is enhanced when employees like their work and are satisfied with their jobs, and that when they are not and choose to resign they should be permitted to do so, and need not be coaxed to withdraw their resignation and return to work. There was no reason why Stern should have done anything more after Elizabeth Levendos chose to resign in accordance with the letter of April 22, 1982. This is true even though he felt relief at her departure, because of quarrels between her and DeVos, and it was harder to replace a chef than a maitre d'hotel. [Tr. 32–33 (April 24, 1989); Tr. 154 (April 20, 1989)]

The fact that Stern at the request of Chef DeVos agreed to interview Ashurst, before Elizabeth Levendos resigned, does not demonstrate Stern's participation in a plan, scheme, or conspiracy to replace her by Ashurst as maitre d' because of her sex. There had been frequent turnover in the past of maitre d' during the operation of Les Nuages and it was prudent business practice to be aware of available qualified potential employees even when no vacancies existed. [Tr. 150–51, 180–82 (April 20, 1989)]

24. There is no evidence that Stern did question her integrity or accuse her of stealing. If she had made timely protest to Stern before resigning Stern might well have determined that any working conditions that would be intolerable to a reasonable employee were attributable to Robert Ashurst or some other person and might have taken appropriate corrective action. This course was precluded by the precipitate resignation by Levendos (submitted perhaps in a moment of anger or pique).

■ 25. With respect to the conditions described in paragraph 19 above, and which the Court as finder of fact, finds did occur, the Court as finder of fact finds that exclusion from management staff meetings and denial of authority to order supplies are not intolerable working conditions that would force a reasonable person to quit. That glasses and supplies in the restaurant were taken for use in the discotheque or Orion Club, while annoying to the employee responsible for effective operation of the restaurant, reflected a business judgment that more profit was attributable to the sale of drinks in those departments than to sales in the restaurant. [See Tr. 187 (April 20, 1989); Tr. 11–13 (April 24, 1989)] Procedures for ordering supplies is also a matter of managerial discretion. These grounds do not amount to constructive discharge.

■ 26. False accusations of stealing and of drinking on the job, and planting wine bottles in her locker to give color to such allegations, are serious grievances which would constitute constructive discharge if approved by executive management. But her premature resignation prevented corrective action by Stern; and his subsequent failure, neglect, or refusal to talk further with Elizabeth Levendos after her resignation was legitimate management policy in response to her premature or precipitate resignation without exhausting recourse to correction through channels or chain of command.

27. Accordingly the claim of Elizabeth Levendos to constructive discharge can not be sustained.

## JUDGMENT

And Now, this 4th day of October 1989, for the foregoing reasons, judgment in No. 84–3051 as to liability for violation of 42 U.S.C. § 2000e–2(a)(1) is rendered in favor of plaintiff, Katerina Levendos, and against defendant Stern Entertainment Systems, Inc.

Within thirty days hereof the parties shall file a stipulation as to amount of damages or a statement evidencing their inability to reach agreement.

In No. 84–3053 judgment is rendered in favor of defendant Stern Entertainment Systems, Inc. and against plaintiff Elizabeth Levendos.